## COMMONWEALTH vs. ROMAN KARL SENDELE.

Suffolk. September 13, 1984. — November 14, 1984.

Present: WARNER, KAPLAN, & ROSE, JJ.

*Controlled Substances. Evidence,* Expert opinion, Bias.

At the trial of an indictment charging possession of cocaine with intent to distribute, a guilty verdict was warranted on the evidence, including evidence that the defendant, who was stopped at a baggage inspection point at Logan Airport, was carrying a large amount of high grade cocaine, in a form associated with distribution, as well as bundles of worn bills totalling $33,020, and that he had been making frequent trips to Fort Lauderdale, Florida. [756-760]

On appeal by a defendant convicted of possessing cocaine with intent to distribute, there was no merit in the defendant's contention that certain questions put to expert witnesses by the Commonwealth impermissibly approached the ultimate questions to be decided by the jury, or that certain testimony by these witnesses encroached on the jury's right to assess credibility. [760]

At the trial of an indictment charging possession of cocaine with intent to distribute, the judge did not err in refusing to permit the defendant to cross-examine law enforcement officers concerning forfeiture proceedings against $33,020 taken from the defendant when he was arrested, despite the defendant's claim that such cross-examination was relevant to show bias. [760-761]

INDICTMENT found and returned in the Superior Court Department on December 21, 1981.

The case was tried before *Meyer, J.*

*Frederick C. Mycock* for the defendant.

*Michael J. Traft,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. On this appeal from the defendant Sendele's conviction of unlawful possession of cocaine with intent to distribute (G. L. c. 94C, § 32A[*a*]),[1] the main question tendered

---

[1] General Laws c. 94C, § 32A(*a*), inserted by St. 1980, c. 436, § 4: "Any person who knowingly or intentionally manufactures, distributes,

by the defense, as put by motions for a required finding of not guilty, is whether there was a case for the jury. We agree with the trial judge that the answer is yes.

1. The defendant was stopped at a baggage inspection point at Logan Airport in Boston about 5:30 P.M., November 30, 1981, as he was on the way to board a Delta airlines plane bound for Fort Lauderdale, Florida. Following were among the items found in his valise.[2] Fourteen and four-tenths grams of white substance in "rock" form consisting 37% of pure cocaine,[3] carried in a plastic "baggie," enclosed in a manila envelope. Four empty manila envelopes. Bundles of worn bills, mostly ten and twenty dollar bills, but also some fifties and hundreds, totalling $33,020. A used air ticket indicating that the defendant had traveled from Fort Lauderdale to New York (the defendant now residing in Bedford Village, New York) on November 28, 1981, two days before the event at Logan. Several air schedules and timetables; on an Eastern schedule, handwritten calculations showing "GR" (grams) in amounts ranging from fourteen to 170, with adjacent figures of $58 or $60.[4] From his person, the defendant took and surrendered a small vial containing 0.8 grams in fine powdery form consisting 36% of pure cocaine; also a three inch straw suitable for "snorting."

State Troopers Andrew Palombo and Michael Doyle, who spoke with the defendant at Logan following the stop, testified about his appearance and his voluntary statements at the time.

---

dispenses, or possesses with intent to manufacture, distribute or dispense a controlled substance in Class B of section thirty-one shall be punished by imprisonment in the state prison for not less than one, and not more than ten years, or by a fine of not less than $1,000 and not more than $10,000, or both."

[2] A motion to suppress was denied after voir dire. No complaint is made of this on the present appeal.

[3] Ordinarily such "rock" requires grinding or chopping and any desired degree of "cutting" with lactose or other inert medium to be amenable to actual consumption.

[4] There was no indication of the drug content involved, whether at common street level (which for cocaine would be 5% or 7%) or a higher level. If the figures represented prices, they were low and might suggest closeness to source or transactions in very large quantities.

He appeared calm and was lucid.[5] He had a runny nose and sniffled, signs consistent with taking cocaine. He said he was a heavy cocaine user, consuming two to four grams daily of high grade stuff, which can be taken to mean a strength approximating that of the cocaine he was carrying. The 14.4 grams of rock he priced at $1,000. (See n.9.) The defendant said all the cocaine carried was for his personal use. The rock, he said, he had broken off from a quantity he had at home. He said the money was the remainder of large sums he had "skimmed" from the receipts of a restaurant with which he had been involved, and he was transporting it in order to enter a business in Florida, his sister, who resided there, being involved; he declined to describe the transaction further. He had no property or assets apart from this money and had been unemployed for a considerable period of time. He said he had made trips to Fort Lauderdale "very frequently."[6]

The Commonwealth called two experts, concededly qualified, Paul O'Neil, a detective in the Boston Police Department's Drug Control Unit, and William Yout, a special agent in the Drug Enforcement Administration of the United States Department of Justice. They testified in part in response to questions in hypothetical form based on the evidence previously received. The nub of their opinions, after taking the various evidential factors into account, was that, while the content of the vial was for the defendant's personal use, the rock in the valise was intended for distribution. The interrupted trip to Fort Lauderdale was an incident in a course of distribution by the defendant, and the rock was itself committed to the same purpose of distribution.[7]

---

[5] This is of possible interest, as some persons attempting to take as high a daily dose of cocaine as the defendant claimed to take (see *infra*) might show perturbation — be "out to lunch," as one expert witness put it.

[6] When the defendant took the stand he gave more precise content to this statement: in the month of November he made some ten trips to Fort Lauderdale, seven by air.

[7] The experts surmised that the 14.4 grams were the remainder of a sale or sales, or had been used as a sample in connection with sales.

The foregoing is the evidence, in short summary, as it stood at the close of the Commonwealth's case. We are persuaded that upon this evidence, viewed in a light most favorable to the Commonwealth, together with the fair inferences to be drawn from the evidence so viewed, a rational jury could find that the defendant was guilty beyond a reasonable doubt. See *Commonwealth* v. *Sheline,* 391 Mass. 279, 283 (1984), and cases cited.

Each instance of a prosecution for possession with the necessary intent has its own singularities, which makes precedent a somewhat imperfect guide; yet our present decision appears supported by the prior holdings. Possession of a large quantity of an illicit narcotic raises an inference of intent to distribute.[8] Here we have an amount of high calibre cocaine whose street value was considerable.[9] Standing alone, the amount or value might perhaps not justify the inference,[10] but we have to add the elements of the physical consistency of the material, its distinct packaging, and its location separate from the vial containing the smaller amount for personal use.[11] Very indicative

---

[8] *Commonwealth* v. *Rugaber,* 369 Mass. 765, 770 (1976). *Commonwealth* v. *Scala,* 380 Mass. 500, 511 (1980). *Commonwealth* v. *Bongarzone,* 390 Mass. 326, 349-350 (1983).

[9] The testimony indicated that the defendant's quotation of $1,000 for the rock was low, but this again would turn on closeness to source. See note 4. Before reaching the street, cocaine of a strength of 37% would probably be "cut" twice, typically enabling the seller to triple in receipts what he or she had paid.

[10] *Turner* v. *United States,* 396 U.S. 398, 423 (1970), suggests that an inference could not be fairly raised from the possession of 14.68 grams, but there the cocaine content was but 5% (see at 401). Compare *Commonwealth* v. *Baltrop,* 2 Mass. App. Ct. 819 (1974) (street value $3,750, conviction sustained). See also *Commonwealth* v. *Rivera,* 6 Mass. App. Ct. 947 (1978). In *Commonwealth* v. *Thibeau,* 384 Mass. 762, 765, S.C., 11 Mass. App. Ct. 677, 683 (1981), a required finding was called for where the defendant was carrying nine bags of "angel dust" on his person, but the court pointed out that there was no evidence of the quantity of narcotic in the bags. That the defendant in the present case might be hoist by his own statement that the rock came from a larger stash, see *Commonwealth* v. *Wooden,* 13 Mass. App. Ct. 417, 423 (1982).

[11] The form of packaging is recognized as a factor on the question of intent to distribute. See *Commonwealth* v. *Davis,* 376 Mass. 777, 779, 788 (1978).

is the large miscellany of money carried in specie by the defendant, who was otherwise confessedly without any resources and unemployed to boot.[12]   Then there is the repeated travel at short intervals to a notorious drug center.[13]   The combination of factors, especially as interpreted and characterized by the experts,[14] makes, we think, a proper case for submission to the jury. The jury could well accept and agree with the experts' conclusions.[15]   So also, the jury by fair inference could reach the conclusion that the defendant's statement about his daily consumption of high grade cocaine was falsely exaggerated to lend color to his claim that all the cocaine he was carrying was for his own use (incidentally his story would assume very large means at his disposal to finance his habit),[16] just as his statement about the source of the money and what he planned to do with it in Florida could be seen by the jury to be a thin fabrication.[17]

---

[12] *Commonwealth* v. *Miller,* 4 Mass. App. Ct. 379, 384 (1976). *Commonwealth* v. *Mott,* 5 Mass. App. Ct. 811 (1977). See *Commonwealth* v. *Rivera,* 6 Mass. App. Ct. 947 (1978); *Commonwealth* v. *Wooden,* 13 Mass. App. Ct. at 423.

[13] One of the experts spoke of Fort Lauderdale as the "so-called cocaine capital of the United States." The city figured in the transaction in *Commonwealth* v. *Sheline,* 391 Mass. at 280.

[14] The importance of testimony by experts in drug cases is manifest from the decisions. See *Commonwealth* v. *Tucker,* 2 Mass. App. Ct. 328, 330 (1974); *Commonwealth* v. *Fiore,* 9 Mass. App. Ct. 618, 624, cert. denied, 449 U.S. 938 (1980); *Commonwealth* v. *Wooden,* 13 Mass. App. Ct. at 422-423; *Commonwealth* v. *Tripp,* 14 Mass. App. Ct. 997, 998 (1982).

[15] This was not a case where the hypotheses of distribution and personal use were supported equally by the record. Compare *Commonwealth* v. *Tripp,* 14 Mass. App. Ct. at 998-999; *Commonwealth* v. *Senati,* 3 Mass. App. Ct. 304, 306 (1975).

[16] Instead of the two to four gram daily dose of high grade material claimed, the defendant might be using only a fraction of that — a difference like that between a tumbler of whiskey and a thimbleful, where the percentage of alcohol is constant in the two drinks. The vial for personal use contained only 0.8 grams.

[17] In *Commonwealth* v. *Miller,* 4 Mass. App. Ct. at 381-382, the defendant tried to explain the money he was carrying by the story (evidently disbelieved by the jury) that it came from the sale of a business and was going to be used to buy land.

We need to say, finally, that the case for the Commonwealth had not "deteriorated" by reason of the testimony offered on the part of the defense (including testimony by the defendant)[18] so as to call for a required finding when the defense rested and renewed its motion. *Commonwealth* v. *Basch,* 386 Mass. 620, 622 & n.2 (1982).

2(a). There was objection to a few questions put by the Commonwealth to the experts on the ground that these approached or nearly coincided with the ultimate questions to be decided by the jury. The judge did not err in overruling the objection. See *Commonwealth* v. *Montmeny,* 360 Mass. 526, 528 (1971); *United States* v. *Kelly,* 679 F.2d 135, 136 (8th Cir. 1982); Fed. R. Evid. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact").

(b). As noted above, the defendant at the time of his arrest was insisting that all the cocaine was for his own use. At trial the defense, in framing its own hypothetical questions to the Commonwealth's experts, incorporated the fact of these statements by the defendant. When the experts then answered that in the light of the other factors they would have to disbelieve those statements, the defense protested (though without taking a clear objection) that the experts were trespassing on the jury's right to assess credibility. This was mere confusion of thought. The experts were not called upon to assume or give it as their opinion that the defendant's statements were true.

3. Under G. L. c. 94C, § 47(*d*), a judge trying a civil forfeiture action has the power within limits, not clearly defined in the statute, to direct the disposition of money that is held properly forfeited. It is understood that on occasion such forfeits have been ordered paid out to the relevant district attorneys' offices to be expended for drug-law enforcement purposes. A forfeiture action evidently was pending against the $33,020

---

[18] The defendant gave rather vague testimony about the alleged "skimming" and the supposed deal in Florida, which he now said concerned the purchase of a restaurant, unrelated, evidently, to the sister. No experts were called by the defense.

taken from the defendant. The defense proposed to cross-examine the officers who spoke with the defendant at Logan with a view to showing bias. This could arise, the defense argued, from the possibility that they might benefit personally from a conviction herein in the sense that it might lead to a judgment for the Commonwealth in the forfeiture action and ultimately to an expenditure from the money recovered for, say, increased overtime services in the detection of drug offenses. But it was problematical what, if any, order a judge might enter and what, if any, use might be made of any money released. Moreover, the testimony by the officers was direct and factual and left little range for the operation of bias. The trial judge was well within his discretion in excluding the intended cross-examination as being remote and inconsequential. See *Commonwealth* v. *Burke,* 339 Mass. 521, 533-534 (1959).

*Judgment affirmed.*