## Commonwealth *vs.* Richard Carlson.

Essex. January 5, 2007. - March 12, 2007.

Present: Marshall, C.J., Ireland, Spina, Cowin, & Sosman, JJ.[1]

*Evidence,* Consciousness of guilt, State of mind, Relevancy and materiality, Voluntariness of statement, Prior misconduct, Motive. *Practice, Criminal,* Instructions to jury, Capital case. *Malice. Intent. Homicide.*

The judge at a criminal trial did not err in admitting in evidence the testimony of two witnesses to the effect that the defendant was not crying and was not "an emotional wreck" shortly after the incident in question, where evidence of the defendant's state of mind at that time was relevant to refute his defense that he had lost control because he had been deprived of his medications, and where the evidence was relevant to the question of the voluntariness of the defendant's statements to police officers and to his waiver of Miranda rights. [504-505]

At a criminal trial, the judge did not err in admitting in evidence testimony concerning the defendant's rental agreement with the victim, where neither trial counsel nor the judge perceived the testimony as evidence of a prior bad act at the time, and the rental agreement was relevant to explaining the financial relationship of the parties; further, no substantial likelihood of a miscarriage of justice arose from the admission of the testimony concerning the agreement. [505-507]

The judge at a murder trial did not err in instructing the jury that they could consider evidence of certain prior bad acts by the defendant on the question of the intent with which the defendant may have acted at the time of the alleged crime, where the prior bad act testimony tended to show that the defendant intentionally beat the victim on the day of the murder as inducement to comply with his request that she go to the bank to get some money, and was further relevant to show that the defendant had the intent to inflict grievous bodily harm on the victim, or that he intended to hurt her to the extent that a reasonable person, in such circumstances, would have known that a plain and strong likelihood of death would follow [507-509]; further, there was no error in the judge's refusal to instruct the jury that they must agree unanimously on at least one factor in deciding that the murder was committed with cruelty or extreme atrocity [509].

Indictment found and returned in the Superior Court Department on August 16, 2000.

[1] Justice Sosman participated in the deliberation on this case prior to her death.

The case was tried before *Peter W. Agnes, Jr.*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services (*Lawrence J. McGuire*, Committee for Public Counsel Services, with him) for the defendant.

*Kenneth E. Steinfield*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on the theory of extreme atrocity or cruelty. On appeal he alleges error in the admission of evidence of lack of remorse, and a rental arrangement allegedly offered as a prior bad act used to take advantage of the victim. He also argues that the judge's instruction on the use of evidence of prior bad acts impermissibly reduced the Commonwealth's burden of proof, and that he was entitled to an instruction that the jury agree unanimously on at least one specific *Cunneen* factor. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). We affirm the conviction and decline to exercise our power under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

1. *Background.* The jury could have found the following facts. In late 1999 the defendant, forty-five years old, and the victim, twenty-eight years old, met at a Dunkin' Donuts restaurant in Salem. Both suffered from mental illness that entitled them to receive disability benefits. The victim had been homeless, but moved into the defendant's apartment expecting they would marry. Before they began living together, the victim and the defendant executed a writing on December 1, 1999, in the presence of Robert Canzano, that provided she would pay the defendant $500 a month for rent, utilities, and food. Her monthly disability income was $545. The defendant's rent was approximately $875 a month, but with subsidies, he paid $185 a month toward his rent.

During the evening of July 30, 2000, the defendant and the victim had an argument that involved loud banging and thumping heard by an upstairs neighbor. As a result, the victim slept on the couch. The defendant arose at 6 A.M. the next morning and tried to get the victim to go to the bank to get some money so he could discharge a debt he owed to drug dealers who were coming to the apartment. Perceiving her to be "half asleep" and unresponsive, he punched her and hit her in the groin. He then

got dressed, put on his work boots, and returned to the living room. The victim was still on the couch, so he grabbed her by the hair and pulled her onto the floor and kicked her. She began to moan and cry but did not get up. He repeatedly stomped on her abdomen, kicked her in the groin, and slammed her head on the floor ten times.[2] The photographic exhibits demonstrate that the beating was massive and relentless. Neighbors heard him yelling at the victim, "Get up, get the fuck up;" "You better get up, you better get up, if you don't get up, you're going to be awful sorry;" "Well, no man's going to want to look at you now;" and "Stop crawling around on the floor, you're — you're messing up the clean laundry."

Shortly after 1 P.M. on July 31, 2000, the defendant left two messages on Robert Canzano's answering machine saying the victim had overdosed on the defendant's medication two days earlier and had been lying on the floor ever since. He said he did not know what to do and was asking for Canzano's help. Canzano returned the telephone calls about one-half hour later and told the defendant to telephone 911. The defendant telephoned 911 at 1:56 P.M. and reported that his girl friend had overdosed and had been on the floor for two days. Two emergency medical technicians (EMTs) arrived within minutes, but the victim was dead and rigor mortis had begun to set in.

An autopsy revealed that the victim died as a result of blunt trauma to the abdomen and head. She sustained "massive contusions" in the abdomen and genitalia that required a degree of force that might occur in an automobile accident. There were fresh bruises on her breasts, arms, back, knees, legs, chin, and buttocks. She had defensive wounds on her hands. There was extensive internal bleeding. It took "hours" for the victim to die as a result of her injuries.

The defendant gave to various police officers, EMTs, a cellmate, and a reporter for a television station different accounts of how the victim died, including self-mutilation, overdose, accident, actions of a third-party culprit, and the defendant's actions in self-defense, all of which were inconsistent with the

---

[2] The defendant had related these details, in tears, to two cellmates while awaiting trial.

autopsy results. The defendant's assertions that the victim had overdosed were contradicted by toxicology test results.

At trial, the defendant did not dispute that he had killed the victim. Instead, he claimed that because of his "limited intellect" and "mental instability," he believed that after their argument the night before the killing, the victim had thrown out the medications prescribed by his psychiatrists. Deprived of his medications, he panicked and was unable to control himself, and he did not intend to kill her. He thus lacked the requisite intent for murder.

2. *Evidentiary issues.* (a) The defendant first contends that the judge erred by admitting, over objection, testimony of an EMT and a police officer, among the first to arrive at the scene, that the defendant "wasn't crying" and "wasn't an emotional wreck." He asserts that "[t]he palpable aim of the prosecutor . . . was to dehumanize the defendant in the eyes of the jury by presenting him as a person lacking ordinary human emotions"; that ambiguous gestures are not admissible as evidence of consciousness of guilt, see, e.g., *Commonwealth* v. *Harris,* 371 Mass. 462, 465, 476-477 (1976); and that a defendant's possible lack of remorse for the victim's death is immaterial. See *Commonwealth* v. *Olszewski,* 416 Mass. 707, 727 (1993), cert. denied, 513 U.S. 835 (1994), citing *Commonwealth* v. *Borodine,* 371 Mass. 1, 9-10 (1976), cert. denied, 429 U.S. 1049 (1977).

Where the defense was that the defendant, believing (even if mistakenly) that he had been deprived of his medications, panicked and "lost control," evidence of his state of mind a few hours after the incident, while he was still arguably under the influence of the operative circumstances raised by his defense (deprivation of his medications), was relevant. See *Commonwealth* v. *Gordon,* 422 Mass. 816, 832-833 (1996). In fact, the prosecutor argued to the jury, without mentioning that the defendant was not crying, that he was not acting out of control for want of his medications, and that if he was a little upset and anxious when the police arrived on the scene it was because he was in the process of trying to cover up his crime.

The evidence also was relevant to the question of the voluntariness of the defendant's statements (and to his waiver of Miranda rights). See *Commonwealth* v. *Boateng,* 438 Mass.

498, 505-506 (2003) ("calm demeanor and lucid conversation suggest" voluntariness). This was a live issue before and during trial, and it properly was submitted to the jury for their consideration under our "humane practice." See *Commonwealth* v. *Tavares*, 385 Mass. 140, 149-150, cert. denied, 457 U.S. 1137 (1982).

The record clearly reflects that the prosecutor did not use or attempt to use the evidence to dehumanize the defendant or to suggest a lack of remorse, and her request for a consciousness of guilt instruction was grounded specifically in different evidence. Moreover, one of the defendant's cellmates testified during direct examination by the prosecutor that the defendant in fact "broke down crying" and was "really upset" when he recounted the events of the morning of July 31, 2000. There was no error.

(b) The defendant next argues that evidence of his rental agreement with the victim, under which she agreed to pay him $500 each month, was used improperly as a prior bad act designed to cause the jury to loathe the defendant, who only paid his landlord $185 a month for rent. We disagree.

The record indicates that the testimony concerning the rental agreement and the rent subsidy was not used by the prosecutor as evidence of a scam or prior bad act against the victim. The testimony was not perceived by experienced trial counsel as evidence of a prior bad act at the time — he did not object on that basis or request a limiting instruction — an indication that it did not have the impact urged on appeal. The judge did not perceive it as evidence of a prior bad act — he did not give the jury an immediate limiting instruction as he did elsewhere during the trial on the admission of prior bad act evidence. Neither party included it in their respective pretrial motions in limine concerning prior bad act evidence. Moreover, the terms of the rental agreement, which provide that the victim would give the defendant $500 each month not only for rent, but also for utilities and food, stood directly in the way of its misuse in the manner urged on appeal, even if the defendant paid only $185 a month for rent.

The rental agreement was relevant because it explained the financial relationship of the parties. See *Commonwealth* v. *Rob-*

*ertson*, 408 Mass. 747, 749-751 (1990). It demonstrated why the defendant would expect the victim to pay him money and why her failure to do so would make him angry and frustrated. It supported the inference that he beat her in order to get her to pay him the money she owed him, which he desperately needed to settle his account with drug dealers whose arrival was imminent. See *Commonwealth* v. *O'Laughlin*, 446 Mass. 188, 208 (2006).

The defendant also argues that Canzano's testimony that the defendant paid $185 a month for rent was inadmissible because no foundation had been established for Canzano's knowledge. At trial, defense counsel objected on the grounds of relevance and hearsay, but not foundation. Although the rental agreement was the centerpiece of the financial arrangement between the defendant and the victim, the testimony in question had some relevance as background to that arrangement. Because no out-of-court statement was offered through the witness, there was no hearsay, see *Commonwealth* v. *Cordle*, 404 Mass. 733, 743 (1989), *S.C.*, 412 Mass. 172 (1992), a point the defendant now concedes. Where the defendant advanced precise grounds at trial in support of his objection, he may not rely on a different ground in his appeal. See *Commonwealth* v. *Cancel*, 394 Mass. 567, 568 (1985); Mass. R. Crim. P. 22, 378 Mass. 892 (1979). Nevertheless, we review to determine if any error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

Although the record is not entirely clear as to the source of Canzano's knowledge with respect to the $185 rental figure, it is reasonable to infer that he was testifying based on information he had received directly from the defendant. Both the prosecutor and the judge had interjected as part of, or after, several prior questions, that Canzano could answer only if he had knowledge. Canzano had indicated earlier that the source of his knowledge of other aspects of the defendant's rent was the defendant himself or the fact that he witnessed the execution of the rental agreement. A proper objection could have settled the question at the time of trial, but the judge could rely on the context in which Canzano had testified previously on the subject of rent and infer that he was testifying based on what the defendant had told him. The defendant has failed to show error.

In any event, we are satisfied that there was no substantial likelihood of a miscarriage of justice. The prosecutor did not use the evidence in the manner argued on appeal, and it is not likely that the jury were misled or prejudiced against the defendant by this evidence because the rental agreement made it clear that the victim was paying the defendant for a share of their food and utilities, as well as the rent.

3. *Jury instructions.* (a) *Prior bad acts.* The defendant argues that, because evidence of certain prior bad acts that fell short of attempts to kill the victim was irrelevant to any of the three "intent" prongs of malice, the judge erred by instructing the jury that they could consider such evidence on the question of the intent with which the defendant may have acted at the time of the alleged crime. The defendant does not challenge that portion of the same instruction that allowed the jury to consider the same evidence on the question of the nature of the relationship between the defendant and the victim, or the defendant's motive.

The prior bad act testimony in question came from two witnesses — one, a neighbor; the other, a friend of the victim. The neighbor testified that, about two weeks before the victim died, she overheard the defendant telling the victim, "Shut up." The victim protested, "Don't hit me again." The defendant replied, "Don't make me do it again," and "You better shut your mouth, I don't care what you say, I'm going to smash you in the face." The friend testified that he had heard the victim telling the defendant on the telephone, "Don't threaten me." He also testified about one occasion when the defendant telephoned looking for the victim. After the friend told him she was not there, the defendant said, "Tell her to get her ass over here or else." The evidence showed that, in the recent past, the defendant threatened to beat the victim if she failed to obey him, or he threatened to beat her as inducement to obey him.

Evidence of prior bad acts may be admitted, not to show bad character or criminal propensity, but to show "a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive" (citations omitted). *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986), and cases cited. Such evidence also may be admitted to show that the victim and the defendant were involved in a hostile relationship. See *Commonwealth* v. *Gil*, 393 Mass. 204, 215 (1984).

Although evidence of a prior bad act offered to show a defendant's intent at the time of a killing often involves an expression of an intent to kill, see, e.g., *Commonwealth* v. *Cormier*, 427 Mass. 446, 449-450 (1998), there is no requirement that the prior hostility be homicidal in any respect. Cf. *Commonwealth* v. *Haley*, 363 Mass. 513, 523-524 (1973) (beating wife two months before killing victim, offered to show intensity of discord between defendant and wife, relevant to defendant's intent in connection with murder victim); *Commonwealth* v. *Bonomi*, 335 Mass. 327, 345 (1957) (evidence of argument between defendant and victim within three months of killing, in which he called her "a dirty son of a bitch," admissible to show hostility); *Commonwealth* v. *Bartolini*, 299 Mass. 503, 510-511, cert. denied, 304 U.S. 565 (1938) (two assaults by defendant on victim within one month of killing relevant to his state of mind and motive). At the most basic level the Commonwealth was required to show that the defendant intended to beat the victim. Here, the prior bad act testimony was relevant because it tended to show that the defendant intentionally beat the victim as inducement to comply with his request that she go to the bank to get some money.

Moreover, the Commonwealth was not required to show that the defendant specifically intended to kill the victim. It only needed to show that he intended to inflict grievous bodily harm on her, or that he intended to hurt her to the extent that a reasonable person, in the circumstances known to him, would have known that a plain and strong likelihood of death would follow. See Model Jury Instructions on Homicide 12 (1999). The prior bad act testimony was relevant to show that he had such intent. It supports an inference that, as a result of the victim's continued unresponsiveness or unwillingness to do his bidding, the defendant intentionally increased the level of violence to whatever was needed to secure her obedience.

The defendant correctly points out that intent, motive, and a hostile relationship are discrete concepts. However, they may be interrelated. Malice, a specific intent, is an essential element of the crime of murder committed with extreme atrocity or cruelty. See Model Jury Instructions on Homicide, *supra*. Motive is not an essential element of the crime of murder, and the Com-

monwealth need not prove that the defendant had a motive. See *Commonwealth* v. *Campbell*, 378 Mass. 680, 688 n.8 (1979). Similarly, a hostile relationship is not an essential element of the crime of murder, and need not be proved. Evidence of motive or of a hostile relationship that tends to explain the purpose of a crime is relevant to the issue of malice or intent. See *Commonwealth* v. *Taylor*, 426 Mass. 189, 198 (1997) (discordant relationship between defendant and victims relevant to issue of malice by suggesting possible motive for murders); *Commonwealth* v. *Cutler*, 356 Mass. 245, 248 (1969) (evidence of hostile relationship relevant to motive or intent). Where, as here, evidence of the defendant's motive to kill the victim and the hostile nature of their relationship were relevant to show the defendant's intent at the time of the killing, and where the judge correctly instructed the jury on the proper use of the evidence of the prior bad acts on the questions of the defendant's motive to kill the victim and the hostile nature of their relationship (matters the defendant does not challenge), there was no error in the instruction as to the jury's consideration of the same evidence on the issue of the defendant's intent.

(b) Cunneen *factor*. There was no error in the judge's refusal to instruct the jury that they must agree unanimously on at least one *Cunneen* factor. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). As the defendant correctly recognizes, we have rejected the identical claim on several occasions, most recently in *Commonwealth* v. *Pov Hour*, 446 Mass. 35, 43 (2006). The defendant has added nothing to the debate that persuades us to change our jurisprudence.

4. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record, the transcript, and the briefs, and decline to exercise our power under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

*Judgment affirmed.*