NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12530


COMMONWEALTH  vs.  RICHARD SHERMAN, JR.



Essex.     November 6, 2018. - February 13, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.


Rape.  Consent.  Practice, Criminal, Instructions to jury,
     Question by jury.  Evidence, Inflammatory evidence, Expert
     opinion.




Indictments found and returned in the Superior Court
Department on December 11, 2014.

The cases were tried before Joshua I. Wall, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Edward Crane for the defendant.
Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.


GANTS, C.J.  A Superior Court jury convicted the defendant

of penile-vaginal and digital-vaginal rape, implicitly rejecting

the defendant's testimony that all sexual intercourse between

him and the victim had been consensual.  On appeal, the

defendant claims that the trial judge committed two reversible errors.  First, the defendant contends that, where the deliberating jury asked the judge whether initially consensual sexual intercourse could become rape if the victim withdrew her consent after penetration, the judge erred by failing to instruct the jury that a defendant may not be found guilty of rape under such circumstances unless the penetration continued after the victim communicated the withdrawal of consent to the defendant.  Second, the defendant argues that, where there was no expert testimony regarding the effect of cocaine on perception and memory, the judge erred in admitting evidence of cocaine use for the purpose of allowing the jury to assess the defendant's ability to perceive and recall events.  We conclude that the judge erred in failing to provide the jury with an instruction regarding the withdrawal of consent and in admitting cocaine evidence for the purpose of assessing the defendant's memory, but that, in the circumstances of this case, neither error requires reversal of the defendant's convictions.

Background.  The primary contested issue at trial was whether the victim had consented to sexual intercourse with the defendant.  The victim and the defendant offered sharply differing accounts of what happened in the early morning of October 14, 2014.  We summarize the evidence at trial.

The victim testified that on the night of October 13, 2014, she drank one beer with a female friend at a pub, and then went with her friend to a second pub.  The two arrived at the second pub at some time between midnight and 12:15 A.M.  Upon arriving, the victim recognized one of her coworkers and the bartender, and began speaking with them.  The defendant, whom the victim did not know, joined the conversation.  The victim and the defendant remained at the pub until approximately 1 A.M., when the pub closed.  The victim drank one beer and one shot at the second pub.

The defendant, the victim, and others continued to talk outside the pub after closing.  The defendant asked the victim if she wanted to "hang out."  The victim agreed, but explained to the defendant that it was "just going to be us hanging out" because she was gay.  The defendant said that was fine, and the two exchanged telephone numbers before parting.

The victim and her friend then went to a restaurant, where the victim received a text message from the defendant:  "I wanna c u 2nite make it happen."  The victim texted back, "Thats fine, but you just need to know that i like girls."  The defendant asked by text whether the victim wanted him to get condoms.  The victim replied by text, "im down to chill but i like girls."  After the defendant texted, "K thats cool . . . ," the victim added, "Plus, not to sound gross but im on my period.  Lol."

The defendant replied by text, "Its all good." The victim then drove her friend home and continued alone to the defendant's apartment, arriving shortly before 2 A.M.

The defendant came downstairs to meet the victim, and the two went up to his apartment. Both the victim and the defendant drank beer in the kitchen while discussing their shared interest in music. The defendant then told the victim that he wanted to show her a record in his bedroom. The victim entered the defendant's bedroom, sat at the foot of the bed, and began looking at the record. The defendant sat down behind the victim and attempted to kiss her on the cheek. The victim responded by putting her hand out and telling the defendant that she was gay and that "it is not going past just hanging out." The defendant apologized multiple times, and then attempted to kiss the victim again. Before she could tell him to stop, the defendant got on top of the victim, put his knees on her thighs, and put his hands on her shoulders. The victim testified that she felt "terrified," that she "froze," and that she was unable to fight back against the defendant.

The defendant then pulled down the victim's pants and pulled her shirt up to her neck. The victim told the defendant to "stop" and to "get the fuck off me," and the defendant asked why. When the victim responded that she was gay, the defendant said "good" and vaginally raped her with his penis. Intercourse

was painful for the victim, who was wearing a tampon, but the defendant "kept going harder and faster." The defendant then put his penis in the victim's mouth. When the victim turned her head away, he inserted his fingers into her vagina. The defendant then vaginally raped the victim with his penis for a second time. The victim screamed "stop" repeatedly and attempted to push the defendant off her by moving her arms from side to side. The defendant then got off the victim.

The victim dressed rapidly, went into the bathroom, and then collected her things to leave. The defendant told the victim not to "worry about the blood," which the victim observed on the defendant's bed, in the kitchen (located between the bedroom and the bathroom), and on the defendant. The defendant then offered to walk the victim to her vehicle. The victim declined. Nevertheless, the defendant followed the victim downstairs, held her vehicle's door open while she tried to close it, and attempted to kiss her. The victim pushed the defendant and drove away.

Soon after leaving the defendant's apartment, the victim called a friend from her vehicle. After five or six telephone calls, her friend answered and the victim told her, "I've been fucked. It just happened. I just got raped." The friend testified that the victim was so "distraught" and "hysterical"

on the telephone that it was initially difficult to understand her.

The victim then drove to her parents' home, and they took her to a hospital where a nurse conducted an evidence collection examination. The nurse testified at trial that the victim -- who, the nurse reported, said that she had been assaulted[1] -- was "horrified, angry, upset, [and] tearful." The nurse further testified that the victim denied being in pain at that time, and that the nurse observed no trauma to the victim's body.

At around 4:45 A.M., the victim met with Salem police Detective Eric Connolly at the hospital. Connolly testified that the victim was "visibly upset" and crying. After speaking with the victim, Connolly and two uniformed officers went to the defendant's address. They arrived at approximately 6 A.M., and the defendant let them into his apartment. The officers asked the defendant whether he had met anybody that night, and the defendant responded that he had had sexual intercourse with a woman, but could not remember her name. Then, while the officers were speaking with him, the defendant lowered his shorts to reveal a "reddish brown stain" resembling blood on his underwear. The defendant also led the officers into his bedroom

---

[1] The defendant did not object to the admission of the testimony regarding the victim's statement that she had been assaulted.

to show them a bloodstain on his bed sheets.  The officers placed the defendant under arrest and transported him to the Salem police department for booking.  During booking, Connolly observed that the defendant had "red brownish stains" resembling blood on his left hand.

That same day, officers obtained a warrant to search the defendant's apartment.  During their execution of the warrant, officers discovered a paper plate with a spoon on it on the defendant's kitchen counter.  The spoon, which appeared burnt, held a white powdery substance believed by Connolly to be cocaine.  Connolly observed more white powder next to the plate. Officers also obtained a search warrant for the defendant's cell phone, which led to extraction of the text messages between the defendant and the victim.

On October 20, the victim went to the Salem police department to have photographs taken of bruises that had appeared on her inner arm and inner thigh after the assault.

The defendant testified that he had been at the pub for several hours when the victim, whom he had not met before, arrived.  The defendant told the victim that he was recently divorced but "still involved" with his ex-wife.  The victim responded that it was not a good idea for the defendant to remain involved with his ex-wife, that he would "probably end up getting hurt," and that he "should move on."  The defendant

replied, "Move on with you?" The victim told the defendant that she "like[d] girls." When he asked, "[Y]ou don't like men?" she replied, "I didn't say that."

After last call, the defendant asked the victim for her telephone number. The victim provided it, and the defendant texted her soon after to ask whether she wanted to meet later that night. The victim agreed, but repeatedly told the defendant that she liked girls. The defendant understood this to mean that in light of the victim's interest in women, he should not "expect a commitment" from the victim.

When the victim texted the defendant to let him know that she had arrived at his apartment, the defendant went downstairs to greet her, kissed her on the cheek, and brought her upstairs to his home. The two were speaking about music in the kitchen when the defendant kissed the victim on the lips. The victim reciprocated, and the two kissed for several minutes. The victim then walked into the defendant's bedroom, and the defendant followed.

When the defendant entered his bedroom, the victim was sitting on the edge of his bed. The defendant joined her, and the two resumed kissing. They also began touching each other's genitals, although the defendant testified that he never inserted his finger into the victim's vagina. The defendant then lowered his shorts, and the victim got off the bed to

perform oral sex on the defendant from the edge of the bed. The defendant did not force the victim to engage in oral sex. After a couple of minutes, the victim removed her jeans and sweatshirt and lay down in the middle of the bed. The defendant lay down next to her, and the two resumed kissing and touching one another. After several minutes, the victim told the defendant to "just put it in her." The defendant asked the victim about her period, and she responded, "I don't care if you don't care." The two then had consensual vaginal intercourse. The defendant testified that the victim did not ask the defendant to stop, push him away, or twist her body.

Afterward, the victim went into the defendant's bathroom for approximately five to ten minutes. When she came back into the bedroom, the defendant and the victim spoke for approximately five to ten minutes about how strange it was that they had never met despite sharing a number of mutual friends. The victim did not seem upset. After this conversation, the defendant walked the victim to her vehicle and kissed her goodbye. The defendant then returned to his apartment. At 3:28 A.M., he texted the victim to say he hoped she got home safely and to ask whether she wanted to get together the next day to "cuddle." The victim did not respond to this message.

Later, police officers arrived at the defendant's door and asked whether he knew the victim. The defendant testified that,

at that time, he thought the police might have come to his apartment because the victim had been involved in an accident. The defendant invited the officers into his home and, when asked, told them that he had had sexual intercourse with the victim. The officers also asked the defendant whether he had raped the victim, and the defendant responded that he had not.

The defendant testified that on the night in question, he had a total of three or four beers at the pub and approximately one-half of one beer at his apartment. The defendant also testified that he had not ingested cocaine or any other drug that evening. When asked about the cocaine found on his kitchen counter, the defendant said that he did not recognize the cocaine and had not used it on the night in question. The defendant also confirmed that he lived alone in his apartment.

At the close of the evidence, the judge instructed the jury regarding the law governing the three indictments of rape: digital-vaginal rape, penile-vaginal rape, and penile-oral rape. The judge instructed the jury that "[i]n order to prove the defendant guilty of this offense, the Commonwealth must convince [the jury] beyond a reasonable doubt of two things: First, that the defendant engaged in sexual intercourse . . . with the alleged victim . . . and, second, that the sexual intercourse was accomplished by compelling [the victim] to submit by force or threat of bodily injury and against her will." With regard

to the second element, the judge went on to instruct the jury that the Commonwealth "must prove beyond a reasonable doubt that at the time of penetration, [the victim] did not consent." The judge also instructed the jury that the force requirement would be satisfied if the defendant compelled sexual intercourse by physical force, violence, threat of bodily injury, or constructive force, which "may be by threatening words or gestures" and requires "proof that the victim was afraid or that the victim submitted to the defendant because his conduct intimidated her."

During their deliberations, the jury sent the following written question to the judge:

> "Need clarification. Is 'time of penetration' the start or duration? Definition of the rape -- does it include if she says No in the middle of the Act? In other words, is it rape if it started consensual and she changed her mind?"

After conferring with counsel, the judge brought the jurors back into the court room and explained:

> "I understand your question to be can lawful sexual intercourse become unlawful at some point during the act. The answer to that is yes, if the Commonwealth proves the second element beyond a reasonable doubt; and the second element includes lack of consent and use of force or constructive force. So, legally, the answer is yes. Lawful sexual intercourse can become unlawful sexual intercourse, but remember that the Commonwealth has to prove . . . both portions of the second element: Lack of consent and use of force or constructive force."

Neither party objected to this instruction.[2]

Later that day, the jury found the defendant guilty on the indictments charging digital-vaginal rape and penile-vaginal rape, and not guilty on the indictment charging penile-oral rape.[3]  The defendant appealed, and we granted his application for direct appellate review.

Discussion.  1.  Withdrawal of consent.  The defendant claims that it was reversible error for the judge not to instruct the jury explicitly that, in order for initially consensual intercourse to turn into rape, a victim must communicate his or her withdrawal of consent to a defendant and the defendant must persist with intercourse despite the communication.  Because the defendant did not object to the judge's instructions concerning the withdrawal of consent, we evaluate whether the instructions created a substantial risk of

---

[2] When the judge first spoke with the attorneys about the jury's question, defense counsel requested that the jury be "instructed that if it starts out consensual, it is consensual up until the point where there is a clear . . . statement to the contrary."  Defense counsel, however, did not press this argument, and did not object to the judge's answer to the jury question.

[3] The judge sentenced the defendant to from six to eight years in State prison on the penile-vaginal rape conviction, and to three years of probation on the digital-vaginal rape conviction, to be served from and after his release from custody.

a miscarriage of justice.  See Commonwealth v. Pires, 453 Mass. 66, 73 (2009).

To find a defendant guilty of rape under G. L. c. 265, § 22 (b), the Commonwealth must prove two elements beyond a reasonable doubt:  first, that there was sexual intercourse between the defendant and the victim; and second, that the defendant compelled the victim to submit to the intercourse "by force or threat of force and against the will of the victim." Commonwealth v. Lopez, 433 Mass. 722, 726 (2001).  See G. L. c. 265, § 22 (b) ("compels such person to submit by force and against his [or her] will, or . . . by threat of bodily injury").  The first element is undisputed here.  The second has been interpreted "as truly encompassing two separate elements": force or threats, and lack of consent.  Lopez, supra at 727.  To satisfy the force or threats element, the Commonwealth must prove "that the defendant committed sexual intercourse . . . by means of physical force; nonphysical, constructive force; or threats of bodily harm, either explicit or implicit" (citations omitted).  Id.  To satisfy the lack of consent element in a typical case, the Commonwealth must prove that "at the time of penetration, there was no consent" (emphasis added).  Id.

We recently described our case law regarding the issue of consent in cases where the defendant alleges that he or she

honestly and reasonably believed that the victim had agreed to

sexual intercourse:

> "In Lopez, 433 Mass. at 727-728, we held that a defendant
> charged with rape is not entitled to raise a defense of an
> honest and reasonable mistake as to the victim's consent,
> noting that our rape statute, G. L. c. 265, § 22, does 'not
> require proof of a defendant's knowledge of the victim's
> lack of consent or intent to engage in nonconsensual
> intercourse.'  A defendant need only intend to perform the
> act by force or threat of force.  Id. at 728-729.  Because
> the Commonwealth is not required to prove that a defendant
> intended the intercourse be without consent, 'a mistake of
> fact as to that consent cannot . . . negate a mental state
> required for the commission of the prohibited conduct.'
> Id. at 728.
>
> "We further determined that requiring the Commonwealth to
> prove that a defendant 'compelled the victim's submission
> by use of force; nonphysical, constructive force; or threat
> of force' negates 'any possible mistake as to consent.'
> Id. at 729.  In so holding, we observed that a mistake of
> fact defense has the potential to 'eviscerate the long-
> standing rule in this Commonwealth that victims need not
> use any force to resist an attack.'  Id.  A rape victim
> need not fend off attackers with physical force 'in order
> to communicate an unqualified lack of consent to defeat any
> honest and reasonable belief as to consent.'  Id.
>
> "Nonetheless, we concluded our analysis by acknowledging
> that a mistake of fact defense as to consent might, in some
> circumstances, be appropriate.  Accordingly, we left open
> the possibility of its use in 'a future case where a
> defendant's claim of reasonable mistake of fact is at least
> arguably supported by the evidence.'  Id. at 732.
>
> "Seven years later, in Commonwealth v. Blache, 450 Mass.
> 583, 594 (2008), we considered whether a defendant charged
> with raping someone incapable of consenting to intercourse
> (due to intoxication) was entitled to an instruction on
> mistake of fact.  Because the Commonwealth is not required
> to prove the use of force beyond that necessary for
> penetration [in cases involving a victim who was incapable
> of consenting], 'the possibility of a defendant's
> reasonable mistake about the complainant's consent could
> increase, creating the potential for injustice.'  Id.  We

> held that 'in such a case the Commonwealth must prove that the defendant knew or reasonably should have known that the complainant's condition rendered her incapable of consenting to the sexual act.'  Id."

Commonwealth v. Kennedy, 478 Mass. 804, 809-810 (2018).

The jury question in this case requires us for the first time to consider whether an additional element of proof -- communication of the withdrawal of consent -- is required to avoid the risk of a reasonable mistake of fact in a case where the jury may find that the initial sexual penetration was consensual but that the victim withdrew consent during the course of continued sexual intercourse.

We have no doubt that consensual sexual intercourse between adults is not only lawful, but a private act of intimacy so important that it is constitutionally protected as a liberty interest.  See Lawrence v. Texas, 539 U.S. 558, 567, 572 (2003); Goodridge v. Department of Pub. Health, 440 Mass. 309, 328-329 (2003) ("how to express sexual intimacy" is "among the most basic of every individual's liberty and due process rights" under Massachusetts Constitution).  We also have no doubt that consensual sexual intercourse can become unlawful where the victim withdraws consent after the initial act of penetration has occurred.  See M.G. v. G.A., 94 Mass. App. Ct. 139, 142 (2018) ("a person's consent may be withdrawn prior to or during the act"); Commonwealth v. Enimpah, 81 Mass. App. Ct. 657, 661

(2012) (where victim consented at time of initial penetration but withdrew consent during intercourse, and where defendant forcibly continued intercourse after victim's withdrawal of consent, jury could have found defendant guilty of rape). Consequently, we must draw a clear line that is crossed when sexual intercourse that begins as a consensual act of intimacy is transformed into rape, one of the most serious crimes punishable by law.  See G. L. c. 265, § 22 (b) (rape conviction punishable by imprisonment for up to twenty years; second or subsequent rape conviction punishable by imprisonment for life or for any term of years); Newsom v. State, 533 P.2d 904, 911 (Alaska 1975) ("forcible rape ranks among the most serious crimes . . . because it amounts to a desecration of the victim's person which is a vital part of [his or] her sanctity and dignity as a human being").

The Commonwealth argues that no additional element of proof is necessary because, where the victim withdraws consent, continued sexual intercourse becomes rape only where the defendant compels the victim to continue to have sexual intercourse by force or threat of force.  The Commonwealth contends that such a finding is, "effectively and essentially, the equivalent of a finding by the jury that the victim conveyed or communicated to the defendant that she no longer consented." In other words, the Commonwealth agrees with the defendant that

a victim must communicate his or her withdrawal of consent, but argues that an instruction on the matter is unnecessary because a jury would always understand that continued penetration that is compelled by force or threat of force could only be so compelled after the communicated withdrawal of consent.

The problem with this argument is that it is far easier to evaluate whether force or the threat of force compelled a victim to submit to a defendant's <u>initial</u> penetration of a victim's vagina, anus, or mouth than it is to evaluate whether force or the threat of force compelled a victim to submit to a defendant's <u>continued</u> penetration.  Therefore, where the initial penetration was consensual, the fairest and clearest way to draw the line separating consensual sexual intercourse from postpenetration rape is to require, as an element of the offense, that the victim reasonably communicate to the defendant his or her withdrawal of consent.  This approach is in keeping with the decisions of a number of State courts.  See, e.g., <u>In re John Z</u>., 29 Cal. 4th 756, 760 (2003) ("the offense of forcible rape occurs when, during apparently consensual intercourse, the victim expresses an objection and attempts to stop the act and the defendant forcibly continues despite the objection"); <u>State</u> v. <u>Robinson</u>, 496 A.2d 1067, 1068-1069 (Me. 1985) (affirming conviction where judge instructed jury that where intercourse is initially consensual "and one or the other

changes his or her mind, and communicates the revocation or change of mind of the consent, and the other partner continues the sexual intercourse by compulsion of the party who changes his or her mind, then it would be rape").

The communication of withdrawn consent certainly need not be made through the use of physical force. Cf. Lopez, 433 Mass. at 729 (noting "long-standing rule in this Commonwealth that victims need not use any force to resist an attack"). It also need not be made through the use of particular words, or through words at all. Physical gestures, such as trying to push the defendant away or attempting to move in a way that would require the defendant to end the penetration, may suffice, provided that these gestures reasonably communicate the withdrawal of consent to a reasonable person in the defendant's circumstances. We emphasize, however, that the Commonwealth need not prove that the defendant actually knew that the victim withdrew consent. It suffices that the victim reasonably communicated the withdrawal of consent in such a manner that a reasonable person would have known that consent had been withdrawn. See id. at 727 ("Although the Commonwealth must prove lack of consent, the elements necessary for rape do not require that the defendant intend the intercourse be without consent" [quotation and citation omitted]).

The requirement of a reasonable communication protects a defendant who lawfully initiates sexual intercourse with a partner's consent from being convicted of rape where the partner withdraws consent during sexual intercourse without communicating the withdrawal to the defendant.  However, we emphasize that we require no such communication of nonconsent in a case where the victim alleges that the initial penetration was without consent.  In such cases, the requirement that the sexual intercourse be compelled by force or the threat of force will typically suffice to protect a defendant from being found guilty of rape based on a reasonable mistake of fact.  See Lopez, 433 Mass. at 728-729.

We also clarify that in withdrawn consent cases, the force or threat of force required for a rape conviction is only that necessary to compel continued intercourse after the withdrawal of consent.  Cf. Lopez, 433 Mass. at 726 ("The essence of the crime of rape . . . is sexual intercourse with another compelled by force and against the victim's will or compelled by threat of bodily injury" [citation omitted]).  No additional use or threat of force is required under G. L. c. 265, § 22.

We expect that these withdrawn consent rape instructions -- explaining that initially consensual sexual intercourse can become rape, adding the element of a reasonable communication of the withdrawal of consent, and defining the element of force or

threat of force as only that necessary to compel continued intercourse after the withdrawal of consent -- will apply only in two rare circumstances:  first, where there is evidence presented at trial that the victim consented to the initial penetration of sexual intercourse and later withdrew consent; or second, where the jury asks a question concerning withdrawal of consent, as they did here.  In the absence of such a jury question, the defendant's testimony that the victim consented to sexual intercourse will not suffice alone to warrant an instruction on the withdrawal of consent after penetration.  Nor will the victim's prior consent to an earlier completed act of sexual intercourse suffice alone to warrant such an instruction.  Rather, in the absence of a jury question, the instruction will be warranted only when there is evidence that the victim initially consented to the sexual intercourse at issue, and then withdrew his or her consent during the course of it.  Only then will instructions on withdrawn consent be needed to prevent the routine instruction -- that the Commonwealth "must prove beyond a reasonable doubt that at the time of penetration, [the victim] did not consent" -- from causing confusion.

Having concluded that the jury question here warranted such instructions, we now consider whether their absence created a substantial risk of a miscarriage of justice.  We must order a new trial under the substantial risk standard "if we have a

serious doubt whether the result of the trial might have been different had the error not been made." Commonwealth v. Azar, 435 Mass. 675, 687 (2002), quoting Commonwealth v. LeFave, 430 Mass. 169, 174 (1999). See Commonwealth v. Brown, 479 Mass. 600, 610 (2018). "We consider the strength of the Commonwealth's case, the nature of the error, the significance of the error in the context of the trial, and the possibility that the absence of an objection was the result of a reasonable tactical decision." Azar, supra. We recognize that we must closely scrutinize this risk where, as here, "the elements of a crime are erroneously stated in the jury charge." See id.

Having evaluated this case with that close scrutiny, we are confident that the jury's verdicts would have been the same had the judge correctly instructed the jury on how to proceed if they found that the victim initially consented to sexual penetration and then withdrew her consent during intercourse. The jury heard no evidence that the victim initially engaged in consensual penile or digital sexual intercourse with the defendant and then later withdrew her consent. The defendant testified that sexual intercourse was consensual at all times; the victim testified that it was never consensual. Although the jury's decision to acquit the defendant of oral rape could potentially mean that they credited the defendant's testimony

that this form of intercourse was consensual,[4] the defendant

testified that the oral intercourse came first.  A victim's

consent to oral intercourse does not necessarily imply his or

her consent to penile or digital intercourse.  In the absence of

any evidence that the victim withdrew initially granted consent

to penile or digital intercourse, we are persuaded that the lack

of an instruction on the matter "did not materially influence[]

the guilty verdict" (quotation and citation omitted).  See

Commonwealth v. Richardson, 479 Mass. 344, 354-355 (2018).

2.  Admission of cocaine evidence.  Before trial, the

defendant filed a motion in limine to preclude the admission of

evidence concerning the cocaine found on his kitchen counter.

The defendant argued that, because there was no evidence that he

was under the influence of cocaine on the morning of October 14,

the cocaine evidence would be more prejudicial than probative.

The judge deferred ruling on the motion until he learned that

the defendant would testify in his own defense, and then ruled

that the evidence was admissible because there was "solid

indicia . . . of [cocaine] use that night" and because evidence

---

[4] The jury may also have had a reasonable doubt whether the
oral intercourse occurred at all.  In contrast with the penile
and digital penetration, that charge was not supported by
physical evidence in the form of stains left by the victim's
blood on the defendant's hand, bed sheets, and underwear.
Furthermore, defense counsel suggested during trial that the
victim had not informed police officers or medical personnel
that she had been orally raped.

of drug use was relevant to the defendant's "ability to perceive . . . and recall events."

After the defendant testified, the judge informed counsel that, although he had initially admitted the cocaine evidence "solely for the purpose of evaluating the defendant's ability to . . . perceive and recall events," he was now also admitting it for the purpose of evaluating the credibility of the defendant, who during direct examination had denied using drugs that evening and during cross-examination had denied recognizing the white substance found on his kitchen counter. The judge instructed the jury that they could use this evidence "only for purposes related to the defendant's credibility" and "the defendant's ability to perceive and recall events as they took place." He forbade the jury from using the evidence to conclude that "the defendant is of a bad character or is more likely to commit crimes." After the close of evidence, when the judge charged the jury, he again instructed them that evidence concerning cocaine could be used only for two purposes: to determine whether drug use affected a witness's ability to perceive and recall events, and to assess the believability of testifying witnesses. Neither party objected to the judge's limiting instruction.

The defendant argues, and the Commonwealth concedes, that it was error for the judge to allow evidence of drug use to be

admitted for the purpose of assessing the defendant's memory where there was no expert testimony regarding cocaine's effects on one's ability to perceive and recall events. We agree. A party that seeks to admit evidence of drug use for the purpose of challenging a witness's ability "to perceive and to remember correctly" is required to "show a connection between the drug use and the witness's ability to perceive, remember, or testify to the event" (citation omitted). Commonwealth v. Alcantara, 471 Mass. 550, 565 (2015). Where there is a lack of reliable general knowledge regarding the relevant effects of a drug, expert testimony is required to show that connection. See Commonwealth v. Gerhardt, 477 Mass. 775, 785-787 (2017) (expert testimony required to establish effects of marijuana); Commonwealth v. Lloyd, 45 Mass. App. Ct. 931, 933 (1998) (expert testimony required to show Prozac's effect on ability to perceive or remember events).

Because the defendant did not object to the judge's limiting instruction and objected to the admission of the cocaine evidence only on the ground that it was more prejudicial than probative because there was insufficient evidence of drug use, we consider whether the error created a substantial risk of a miscarriage of justice. See Commonwealth v. Carlson, 448 Mass. 501, 506 (2007) ("Where the defendant advanced precise grounds at trial in support of his objection, he may not rely on

a different ground in his appeal"); Commonwealth v. Perez, 405
Mass. 339, 342 n.3 (1989), citing Commonwealth v. Freeman, 352
Mass. 556, 563-564 (1967) (where objection below was on grounds
different from those raised on appeal, court considers whether
error created substantial risk of miscarriage of justice).  We
conclude that it did not.  There was no evidence that drugs
played any role in the events of October 14, and neither
attorney mentioned the cocaine in closing argument.  See
Commonwealth v. Niemic, 472 Mass. 665, 673 (2015) (although
cross-examination on particular issue was improper, "prosecutor
did not mention the matter in his closing argument, thus keeping
any prejudice at a minimum").  Furthermore, where the jury
acquitted the defendant of one of the three rape charges, we
conclude that it is unlikely that the drug evidence was given
significant weight in the jury's evaluation of the defendant's
testimony or culpability.  See Commonwealth v. McCoy, 456 Mass.
838, 844 (2010) ("acquittals on two indictments indicate an
unbiased jury"); Commonwealth v. Delaney, 425 Mass. 587, 595
(1997), cert. denied, 522 U.S. 1058 (1998) (where jury acquitted
defendant of certain charges, it was "clear that the jury
carefully considered the evidence with regard to each crime
charged").[5]

---

[5] The Commonwealth argues that the cocaine evidence was
properly admitted to impeach the defendant's credibility, and

Conclusion.  For the reasons stated above, we affirm the defendant's convictions.

So ordered.

---

points out that there was no objection to the admission of the evidence for this purpose.  Defense counsel, however, questioned the witness about cocaine -- subjecting the witness to later impeachment -- only after the judge ruled that cocaine evidence was admissible for the purpose of determining the defendant's ability to recall and perceive events.  Because we conclude that the judge's error did not create a substantial risk of a miscarriage of justice, regardless of whether the cocaine evidence otherwise would have been admitted, we need not decide whether that evidence was properly admitted for impeachment purposes.